S.E.C. v. Hall Good morning. May it please the Court, my name is Jared Perez. I'm counsel for Christopher Hall in this matter. I'm going to focus my comments today on the issue of disgorgement because that's the, I think, the biggest impact of this judgment to my client and also the As I'm sure the Court is aware, we had two orders here. We had an initial order by the District Court on disgorgement that basically said, yes, Mr. Hall obtained several million dollars through misrepresentations, as the jury found, but he also provided collateral in connection with the pertinent transactions that adds up to more than $24 million. And what the S.E.C. is asking us to do here is to have him disgorge all of the money he obtained, but ignore all of that collateral, ignore the $24 million that he provided the counterparties in those transactions. And the District Court said, that's punitive, it's speculative, it doesn't focus on Hall's unjust enrichment, and I can't do it. And we think that that order was precisely right on this issue. And the S.E.C. files a motion for reconsideration, and the District Court essentially adopts the S.E.C.'s argument, which is, these counterparties could have obtained this collateral anyway, so we should just ignore it. We should treat the money that Mr. Hall obtained as his ill-gotten gains, as his net profits, and pay no attention to the $24 million in collateral that he provided. Do you dispute the contention of the S.E.C. that the party that was seeking the collateral, assuming that there were no liens on it, could have obtained that amount of collateral in any event? Yes, we do, and I would refer the Court to a reply brief at pages 7 through 10, where the evidence in light of that is laid out. So this is a brokerage firm in a margin situation, and it was a margin call situation back during the financial crisis, where valuations were down, the brokerage was demanding additional collateral, Mr. Hall was putting the collateral up. All of the assets, all of the collateral that we're talking about today, was held outside of the brokerage firm. The brokerage firm did not have any right to obtain those assets. That's why these transactions occurred, or it was necessary for them to occur, because without them, they would have never received any of that collateral. They would have liquidated the collateral they already had. Yes, that was their one option, to liquidate the collateral they already had. They did not want to do that, though, and as also explained in this section, the stock here is a company called Call Now, it owns some bonds, and the bonds were involved in a racetrack in Texas, I believe. And all parties thought that the Texas legislature was going to legalize gaming at the racetrack. So they didn't want to liquidate that position because they saw value in it. They being the brokerage firm, and Mr. Hall did too. And Mr. Hall also owned, as part of that collateral, stock in an affiliate of the brokerage firm. And if that was liquidated at these low prices, it would have had a negative impact on the brokerage firm. So their option was to liquidate, like you would in a margin call situation, but they didn't do that. But they called for more collateral. They did. So I guess what I'm trying to get at is what the SEC is saying, is that they were entitled to get this collateral in any event to avoid having to liquidate, which nobody seemed to want. And if they were entitled to get this collateral in any event, and yet Mr. Hall lied and said, there are liens on it, and the brokerage firm wanted to preserve their position on the loan, so they gave him money that they would not have given him but for the lie. So how do you address that? If they could have gotten the collateral unencumbered, which is what the government is saying, how does that not make a difference? I understand the government's saying that, but I think the trial evidence and the evidence cited in the briefs shows that they could not have done that. And I will refer to, because that's exactly the argument that the district court adopted, and we excerpt part of it in our initial brief at page 28, and it's at .150 at 5 in the district court record. Well, I guess that's what I'm trying to get at is, so there's a certain value of collateral that your client gave to the brokerage firm. And I guess I'm just trying to get at, what is your point to dispute that they were not entitled to get this collateral in any event? Because they could have liquidated the account. We agree that's one option, but they can also call for more collateral, and they did. Are you saying your client gave them a higher value of collateral than he needed to because he then got the loan monies? Well, he obtained $5.5 million from the brokerage firm to pay off those liens, which did not exist. So that happened. But he gave $24 million worth of collateral, and that can't be ignored. And I think the problem here is a misunderstanding or misapplication of the burden-shifting analysis that applies to calculating disgorgement. And I think the SEC and Mr. Hall and the district court all agree on how that analysis is supposed to work. The SEC is only required to show a reasonable approximation of Mr. Hall's unjust enrichment, and then the burden shifts to Mr. Hall. And the reason for that is because the defendant usually has better knowledge about what he paid for the securities, what they were worth, and things like that. But here, we're not talking about numbers. We're not talking about valuations. We're not talking about dollars. But Mr. Hall didn't give an additional $5 million of collateral to offset the money that he took, right? In a series of transactions, well, yes, because he gave $24 million in total collateral and took approximately five. There's a range. He was also collateralizing the amount. He was already underwater, plus however much security, and this happens all the time. You know, you're $10 million underwater. I want a lot more than $10 million in collateral because of what you're like and what the market's like. Isn't that right? I mean, the reason he gave them X amount was that that was what they negotiated. That is right. That is what the parties negotiated. And all I'm saying is you have to look at both sides of that negotiation. You can't just focus on the money that he obtained through the misrepresentations and ignore the other assets that were provided. And what happens is- Those assets went south. That's why we're in court. That is, if the collateralized assets had not gone south, there would have been enough money to make everybody whole. But instead, we've got, you know, who's holding the bag when the money has gone away because the market went away. Isn't that right? There are two pools of collateralized assets, though. There are the initial assets that went south that required the margin call. And then there's the additional $24 million- That went south also because even your own unsupported statement that, well, they returned a couple of hundred thousand, you know, is because those assets evaporated as well. Isn't that right? Otherwise, there would, in fact, be enough to pay off. That is, if there was enough to pay off, you would have some argument, okay, that, well, we're just shifting peas around. But because of the lies, he got money, which he then dissipated or whatever, that Penson wouldn't have given him. That last sentence is the issue here. And that's what the district court says in the order. As demonstrated by the SEC and not rebutted by Hall, had Hall not lied about the liens encumbering the collateral, Penson and Hall still would have agreed to Hall posting the collateral. But that's speculative. It's speculative and not part of the burden-shifting analysis that should apply to calculations to disgorgement. It's speculation about human behavior, what people would have done in the hypothetical situations. And it's contrary to the record evidence, which I think is set forth in the citation to the reply brief that I cited, that these assets were all held outside of the brokerage firm. Hall could have told the firm, no, I'm not posting any more collateral, liquidate. What happens then? How does the economics of everything shake out? Who comes up on top? And who doesn't? Well, we don't know that. But that's my point. It's speculative. The burden-shifting analysis and the disgorgement calculation should be about Hall's unjust enrichment. Dollars in, dollars out. What the SEC wants to do is look at the dollars in and ignore all of the dollars out because, well, this would have happened anyways. But what would have, could have happened, and what Mr. Hall would have or could have done if that did happen in this hypothetical scenario, it's speculative. And it's not what disgorgement is. Let me ask you about something else before you sit down, about your materiality argument. Why is that not an argument about the sufficiency of the evidence that you can't make because of your failure to make a Rule 50B motion after the jury deliberated? The materiality argument is, I think, primarily, in full candor, an argument about the sufficiency of the evidence. And I think the way it relates here is playing into the disgorgement in that the parties made certain arrangements and they entered into documents. And those documents, transaction documents, are the best evidence of the party's intent. They show dollars going this way and dollars coming this way. And you can't ignore one side of that transaction. Good morning, Your Honors. May it please the Court. Paul Alvarez for the Securities and Exchange Commission, and with me is Sarah Kincannon, Lead Trial Counsel for the Commission in the District Court. Your Honor, the undisputed evidence shows that Christopher Hall repeatedly lied to his broker regarding his margin account. And as a result of those lies, he walked away with millions of dollars that he wouldn't have gotten had he told the truth. He used that money for his own personal gain, and he has never paid any of it back. In light of that undisputed evidence, it was not and could not have been an abuse of discretion for the District Court to order him to disgorge the proceeds of his fraud on Penson. Now, my friend has argued that the District Court erred because he claims it failed to consider the value of the Call Now shares that were deposited in his margin account in 2009. But the District Court didn't ignore the value of those shares at all. In fact, the District Court found, in light of the undisputed evidence here, that Mr. Hall had deposited those shares in his margin account to offset the tens of millions of margin debt that he had accrued up until that point. And the District Court further found that in light of that fact, Penson gave him the full credit for the value of those shares against his preexisting margin debt. So he received a reduction in the value of those shares against his preexisting debt by virtue of that pledge in 2009. So the District Court didn't ignore that evidence, but rather the District Court reasonably concluded that because he had received a credit of the full value of those shares against his preexisting margin debt, he was not entitled to a second credit relying on the value of the same shares against the proceeds of his fraud. And in terms of – my friend has referred to this as sort of a quid pro quo exchange of dollars from Penson in exchange for shares from Mr. Hall. But there's absolutely no evidence to support that. As you said, Judge Boggs, remember this was – he was tens of millions of dollars in debt. And my friend's argument ignores the $38 million elephant in the room, and that is his preexisting debt. Those shares were pledged to offset that. And the value of those shares – Well, I understand that, and I understand that when he pledged the collateral, he got a credit, and his account was now bigger, of course, until things went south. My question is this. When you're a brokerage and you want collateral, you know, it's just like taking a mortgage. You only want to lend 60 percent on a mortgage. So the collateral is going to be bigger than the exact amount that you're collateralizing. Why isn't it plausible to say that had he not made this lean argument, they wouldn't have demanded $15 million in collateral? They would have only demanded $12 million, or $11 million, or $10 million, or $13 million, or some negotiated amount, because it's not exact. So what's wrong with that argument? Well, sure. Your question actually illustrates the fact that the money that Penson paid out to pay down the fictitious liens is completely independent from the value of the collateral that he pledged. I mean, if Mr. Hall – he said that this is a hypothetical – When you say completely independent, this was all happening at the same time, wasn't it? Yes, but if you consider – If P. Hall walks into Penson or Penson calls him on the phone and they say, you know, give us collateral, and he says, here's some collateral, and says, by the way, I need this other money, isn't it plausible that Penson is going to want more collateral to some degree? I'm not saying it's dollar for dollar, but simply as an economic negotiating instrument, isn't it, that you're going to want more collateral if you're actually going to give him money back? Well, two things on that. Number one, that's not what happened in this case. Penson issued separate promissory notes for the money it paid out for the liens. And in terms of what he did, if he tells the truth and he pledges the collateral, whatever the value is, whether it's $24 million, $15 million, $3 million, $25,000, he would have gotten the full credit against his pre-existing margin debt. But Penson isn't out the millions of dollars it paid to pay off the fictitious liens that it thought existed. That's why I've argued that they are two independent things. Obviously, they happened at the same time, but if he tells the truth, whether he pledges collateral or doesn't, Penson isn't defrauded by millions of dollars. And so, in terms of your question, again, Penson issued those promissory notes separately, didn't demand separate collateral for that. And at this point, it wouldn't have made sense for Penson to have given that money because he was already tens of millions of dollars in debt. And had they known that the liens didn't exist... Did that begin after the $15 million in collateral? Yes, by the time, by the end, his account was $38 million. Yeah, at the time, he had had over $9 million in the equity, was underwater $9 million, and he had had $15 million in margin calls up to that point. So he was about $25 million already at the time in 2009. And then it continued to get worse. But the idea that this was a quid pro quo of dollars for shares is just, I know he said that this is in the record, but there's nothing in the record to support that. But you say that he got a full credit for this. You seem to be saying it still wasn't enough to get him above water. No, it wasn't enough to get him above water. Penson was willing to carry him just by getting somewhat better, but not by getting well. Right, and I think this illustrates the problem in the SEC's interest in this issue. I mean, the extension of margin debt is a very significant thing that the Commission is concerned with. And when you don't comply with Section 7, as neither Mr. Hall nor Penson had done here, you run into these problems where you're sort of borrowing to kick the can down the road as much as you can. And then you end up in a situation like Penson was in, where they are now liquidated because of the overextension of this margin. So this money, if you do disgorge it, the taxpayers are going to get it, and nobody else that's lost all their money is going to get any of it? Well, I don't know about that. I don't want to get ahead of the collections people. The SEC, it's our policy to try and restore money to victims of fraud. And I know that Penson is still in liquidation, so we're still identifying, in the process of identifying victims. And to the extent that there are victims that we can identify, we will submit a position  The victims would be like the creditors of Penson? Yes, and shareholders as well of Penson. The District Court entered an injunction in joining Hall from violating the securities laws in the future. Isn't that the type of follow-the-law injunction that our court has said is unenforceable? No, and he's not challenging that here. He's really only challenging the fact that he wasn't egregious. He's not making that argument here as I understand it, but rather he's only challenging the level of egregiousness. And I think the evidence supports this was significantly egregious to warrant a permanent injunction. You're not familiar with our case law about follow-the-law injunctions? No, I am, but again, I don't think he's challenging the injunction on those grounds. So, you know, and I think that it was appropriate for the District Court to have enjoined him here given the significantly egregious nature of his misconduct and the fact that he has not challenged the other five factors found by the District Court. So even on the basis of those five factors alone, I think the permanent injunction should stand particularly in light of the fact that he's not making that argument here. He hasn't made it before this court. On the issue of the, Mr. Hall has insisted that there is an additional amount that he paid to Osner, the $350,000 plus $32,000 in interest. Why wouldn't those payments have been excluded from the disgorgement? Well, as we demonstrated below and I think in this court, we are happy to reduce the amount of his disgorgement order to the extent that there is evidence that he has paid that money. Mr. Hall has referred to two things. One, his own unsupported testimony and two, a document that was not introduced at the remedy stage that shows only that a $31,000 payment was made. We don't know what that payment was made for and it certainly doesn't indicate that there was $350,000 that were made to Ms. Osner. So there's just no evidence to show, certainly wasn't any evidence before the District Court to show that he had paid that money to the extent that he can show proof of that. In terms of paying that down, we would reduce it but because there is no evidence of that, it was not error for the District Court not to have reduced the disgorgement amount by that $350,000 plus interest amount. Unless the Court has any further questions, I'll cede the remainder of my time and ask that the District Court's final judgment be affirmed. Thank you very much. I just have one or two very brief points. The Commission just now referenced Hall's multimillion dollars in margin debt. The only numbers that I've seen in its brief was a reference to the $10 million in the red that the account was at the time that these transactions occurred. I think that the issue of whether you count that collateral or not, it has to be addressed. Arguing that, okay, it was applied to the margin debt is one thing, but arguing that it should be ignored entirely because they would have gotten it anyways. That's what the Commission argues and that's what the Court does find in the second order. It's the reason that the Court determines that the Commission carried its burden under the burden-shifting analysis and Hall failed to do so because the Commission came up with this hypothetical situation about what would have happened in alternate circumstances and Hall purportedly did not rebut the hypothetical. So I think in some ways what was applied to the margin account, what was the balance, and what time when each of these things happened is a little bit of a side issue because the decision, the second order, really rests on this hypothetical about what would have happened and the Court's finding that the hypothetical, not any calculation, but this hypothetical ability to obtain the collateral carried the day in the burden-shifting analysis and that Hall didn't rebut that. And the only way to rebut that is with another hypothetical or Hall's testimony of what he would have or could have done, which like the Commission just did, it would call self-serving. And once you get into that territory, you're speculating, you're not focusing on unjust enrichment, you're making a punitive use of the disgorgement calculation, and for that reason I think, in addition to the other arguments in our briefs, that the District Court did abuse its discretion in the second order by ordering disgorgement. Thank you.